**Myrtle V. JONES, Defendant Below, Appellant,**

v.

**APPROVED BANCREDIT CORP., an Ohio corporation, Assignee of Albee Dell Homes, Inc., a Delaware corporation, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Aug. 1, 1969.

Robert B. Walls, Jr., Wilmington, for defendant below, appellant.

John Merwin Bader, Wilmington, for plaintiff below, appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice:

The dispositive question in this appeal is whether the plaintiff finance company is a holder in due course of the defendant's note. We hold that the finance company was not a holder in due course under the party-to-the-transaction rule.

### I.

The relevant facts are undisputed for present purposes:

The defendant, Myrtle V. Jones, owned a lot of land in Delaware and wished to have a house built on it. She responded to a newspaper advertisement by Albee Dell Homes, Inc. (hereinafter "Dell"), a sales agency for pre-cut homes in Elkton, Maryland. After selecting a type of house from various plans presented, Mrs. Jones signed a purchase order contract and credit application and made a deposit. Several weeks later, Dell's representative presented to Mrs. Jones for signature a series of documents evidencing an obligation of $3,250.[1] to be paid by Mrs. Jones in monthly installments over a period of years for the house. The documents evidencing the obligation included the following papers: a mortgage; a judgment bond and warrant; a promissory note; a construction contract; a request for insurance; an affidavit that the masonry work and foundation were completed and paid for (when in fact none of the work had been commenced); and an affidavit that no materials were delivered or work started as of the date of the mortgage.

Mrs. Jones demurred to the signing of the mass of documents thus placed before her and stated that she would like to con-

sult her attorney before signing because she did not understand the documents. Dell's representative objected, stating that it was not necessary for Mrs. Jones to have an attorney; that it would be a waste of money to do so; that he would advise her. Although Mrs. Jones reiterated her wish for an attorney several times, Dell's representative insisted upon her signing the papers then and there, stating that it was necessary to do so if the work was to start seasonably. He assured her that Dell would take care of the entire situation to her satisfaction. Mrs. Jones finally acquiesced and signed all the documents. Immediately thereafter, the paper was endorsed and assigned by Dell to the plaintiff Approved Bancredit Corp. (hereinafter "Bancredit") which paid Dell $2,250. for the $3,250. note.

During the construction, an employee of the builder drove a bulldozer into the side of the partially completed house and knocked it off its foundations. Thereafter, the builder refused to go forward with the work. Dell disclaimed responsibility on the ground that the damage to the structure was the result of a "cave-in" and was "a work of God". The structure was left in a dangerous condition with the water-filled basement constituting an attractive nuisance to children. The County authorities demanded that this unsafe condition be rectified. Mrs. Jones consulted an attorney who notified Dell and Bancredit that Mrs. Jones would be obliged to remove the remnants of the building and fill the basement, in order to make the area safe, unless another satisfactory course of action was suggested. There was no reply and the demolition was accomplished at Mrs. Jones' expense. Later, Dell closed its office and terminated its business except for the servicing of certain contracts through a representative in Delaware.

Thereafter, Bancredit brought this action against Mrs. Jones,[2] seeking fore-

---

1. The principal amount of the obligation was $2,500. The balance consisted of "charges".

2. It is noteworthy that although Dell's endorsement to Bancredit was "with recourse", Bancredit proceeded directly against Mrs. Jones.

closure on the mortgage and collection of an unpaid balance of $2,560.23, with interest. Mrs. Jones interposed several defenses, mainly that of fraud by Dell. During pretrial proceedings, the action developed into a suit upon the promissory note,[3] which Bancredit contended was secured by the mortgage and was negotiable in its hands as a holder in due course by assignment of Dell. Thereupon, Bancredit moved for summary judgment on the ground that the defenses claimed against Dell were not available against it as a holder in due course. The Superior Court denied summary judgment, stating that Mrs. Jones should have the opportunity to "demonstrate the precise relationship" between Dell and Bancredit. Thereafter, depositions were taken and the following facts, *inter alia,* appeared regarding that relationship:

Dell and Bancredit were both wholly owned subsidiaries of Albee Homes, Inc. (hereinafter "Homes"). The business of the parent corporation was to process precut lumber and to sell pre-cut homes. It had between 50 and 70 sales agencies in 19 states; Dell was its Maryland sales agency. 99% of Bancredit's business came from Dell and the other wholly owned sales agency subsidiaries of Homes; it was organized for this purpose. Bancredit examined into the laws of the various states in which the sales agencies operated and prescribed the forms of contracts and financing documents to be used by each agency, including Dell, in concluding a transaction. Homes and Bancredit had the same officers and directors; Homes named the directors and officers of Dell. Checks of Bancredit, issued to consummate a financing transaction like that entered into by Mrs Jones and Dell, were countersigned by Homes. During the construction of a house, Bancredit routinely requested and received progress reports. Specifically, the manager of Bancredit testified on deposition that Bancredit was a "finance department" of Homes; that each transaction of Dell, like the transactions of each of the other sales agencies, was approved in advance by Bancredit; that the first paper received was the application of the purchaser for extension of credit which was reviewed and passed upon in advance by Bancredit, with directions back to Dell as to any special condition to be imposed upon the purchaser in connection with the loan under consideration. Bancredit had the exclusive power of approval, condition, or rejection of a transaction tendered by the sales agency.

As the result of a pretrial conference, the Trial Judge stated that with a full understanding of the evidence to be adduced by each side at trial, he had concluded that a directed verdict in favor of Bancredit must necessarily result because, in his opinion, Bancredit was a holder in due course and the defenses sought to be interposed by Mrs. Jones were not available as to it. Each of the parties then made a detailed offer of proof on the record and, thereupon, the Superior Court entered judgment for Bancredit on the ground that it was a holder in due course. Mrs. Jones appeals.

II.

The question before us has not been heretofore answered by this Court. It is a difficult question, as to which the authorities are in sharp conflict.

In dealing with the holder in due course status, a basic problem has been recognized by the courts in cases involving the financing of installment sales, especially of consumer goods and household improvements.

3. The promissory note was executed on October 29, 1963. The Uniform Commercial Code, 5A Del.C., became effective in Delaware in 1967. The note, therefore, is governed by the Uniform Negotiable Instruments Law, 6 Del.C. Ch. 1. § 152 thereof defined a holder in due course as one who (among other prerequisites) purchased the instrument "in good faith and for value". A holder in due course is not subject to defenses, such as fraud in the inducement and failure of consideration, which may have been available to the maker of the paper against the payee-endorser. 6 Del.C. § 157. Compare 5A Del.C. § 3–302 and § 3–305.

The problem arises from the increasingly apparent need for a balancing of the interest of the commercial community in the unrestricted negotiability of commercial papers, on the one hand, against the interest of the installment buyers of the community, on the other hand, in the preservation of their normal remedy of withholding payment whenever there has been misrepresentation, failure of consideration, or other valid reason for refusal to pay. This problem and this need have given rise to this concept: the more the holder knows about the underlying transaction which is the source of the paper, the more he controls or participates in it, the less he fits the role of good faith purchaser for value; and the less justification there is for according to him the protected status of holder in due course considered necessary for the free flow of paper in the commercial world.

The rule, balancing the needs of the installment-buying community and the commercial community, has evolved in various ways. Many courts have solved the problem by denying holder in due course status to the finance company where it maintains a close business relationship with the dealer whose paper it buys; where the financer is closely connected with the particular credit transaction under scrutiny; or where the financer prescribes to the dealer the forms of the papers, the buyer signs the purchase agreement and the note concurrently, and the dealer endorses the note and assigns the contract immediately thereafter. In such situations, many courts look upon the transaction as a species of tripartite transaction; and the tenor of the cases is that the finance company, in such situation, should not be permitted to hide behind "the fictional fence" of the U.N.I.L. or the U.C.C. and thereby achieve an unfair advantage over the purchaser. See Unico v. Owen, 50 N.J. 101, 232 A.2d 405 (1967); Buffalo Industrial Bank v. DeMarzio, 162 Misc. 742, 296 N.Y.S. 783 (1937).

The rule of balance thus evolved is exemplified by Mutual Finance Co. v. Martin, Fla., 63 So.2d 649, 44 A.L.R.2d 1 (1953). There a finance company was held not to be a holder in due course where it appeared that the finance company furnished to the payee electrical appliance dealer the form of conditional sales contract and promissory note with its name imprinted thereon; that before the sales transaction occurred the finance company had investigated the purchaser's credit standing, had approved the proposed terms and agreed to purchase the contract and note in the event the transaction was consummated; that over a period of years immediately prior to the transaction, the finance company had provided much financing for the dealer in other transactions. In holding that, under those circumstances, the finance company was sufficiently a party to the transaction to deprive it of holder in due course status, the Supreme Court of Florida stated:

"* * * It may be that our holding here will require some changes in business methods and will impose a greater burden on the finance companies. We think the buyer—Mr. & Mrs. General Public—should have some protection somewhere along the line. We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers. * *

"If this opinion imposes great burdens on finance companies it is a potent argument in favor of a rule which will afford protection to the general buying public against unscrupulous dealers in personal property. * * *."

Another leading case supporting the rule of balance is Commercial Credit Co. v. Childs, 199 Ark. 1073, 137 S.W.2d 260, 128 A.L.R. 726 (1940) wherein the automobile sales contract, note, and assignment forms were attached together, were furnished by the finance company, and were all executed on the same day. The Supreme Court of Arkansas there stated:

"We think appellant was so closely connected with the entire transaction or

with the deal that it can not be heard to say that it, *in good faith*, was an innocent purchaser of the instrument for value before maturity. * * * Rather than being a purchaser of the instrument after its execution it was to all intents and purposes a party to the agreement and instrument from the beginning. * * *"

See also Commercial Credit Corporation v. Orange County Machine Works, 34 Cal. 2d 766, 214 P.2d 819 (1950) where the Supreme Court of California held:

"When a finance company actively participates in a transaction * * * from its inception, counseling and aiding the future vendor-payee, it cannot be regarded as a holder in due course. * * *"

And in Unico v. Owen, 50 N.J. 101, 232 A.2d 405 (1967), wherein the finance company was formed expressly to handle the financing of sales by the dealer exclusively, the Supreme Court of New Jersey summarized its position on the question before us as follows:

"For purposes of consumer goods transactions, we hold that where the seller's performance is executory in character and when it appears from the totality of the arrangements between dealer and financer that the financer has had a substantial voice in setting standards for the underlying transaction, or has approved the standards established by the dealer, and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards, the financer should be considered a participant in the original transaction and therefore not entitled to holder in due course status. * * *"

The factual situation in the *Unico* case is especially analogous to the instant case.

The divergent line of cases, reflecting an underlying conflict in policy considerations, accords determinative importance to the maintenance of a free flow of credit. These cases protect the finance company from purchaser defenses on the ground that this is an overriding consideration in order to assure easy negotiability of commercial paper and the resultant availability of the rapid financing methods required by our present-day economy. The cases of both lines of authority are collected at Annotations, 128 A.L.R. 729 (1940), 44 A.L.R.2d 8, 134–157 (1955), 4 A.L.R.2d Later Case Serv. 929 (1965). See also Swanson v. Commercial Acceptance Corporation (9 Cir.) 381 F.2d 296 (1967); 39 S.Cal.L.Rev. 48, 68–74 (1966); 10 Vill.L.Rev. 309 (1965); 65 Colum.L.Rev. 733 (1965); 53 Harv.L.Rev. 1200 (1940); 1958 Wash.U.L. Q. 177; 35 U. of Chic.L.R. 739 (1968); 39 Minn.L.Rev. 775 (1954).

### III.

Under the totality of facts and circumstances of this case, we hold that the rule of balance should be adopted and applied; that it should operate in favor of the installment buyer for the reason that, in our opinion, Bancredit was so involved in the transaction that it may not be treated as a subsequent purchaser for value. By reason of its sister corporation relationship to Dell and the established course of dealing between them, Bancredit was more nearly an original party to the transaction than a subsequent purchaser of the paper; and, for the reasons of fairness and balance stated in the foregoing authorities, Bancredit should be denied the protected status of holder in due course which would prevent Mrs. Jones from having her day in court on the defenses she would have otherwise had against Dell.

The rule we here adopt must be applied carefully because of the delicate balance of the interests of the installment buying community and the commercial community. But the need for special care in application should not foreclose the adoption of the rule and its application in a proper case. In this day of demonstrated need for emphasis upon consumer protection and

truth in lending, special consideration must be given to preventing the misuse of negotiable instruments to deprive installment purchasers of legitimate defenses. In a proper case, such as the one before us, this becomes the controlling consideration.

For the reasons stated, we conclude that the Superior Court erred in holding that Bancredit was a holder in due course. Accordingly, the judgment below is reversed and the cause remanded for further proceedings consistent herewith.