388 So.2d 879 (1980)
DOBBS-MAYNARD COMPANY, INC.
v.
Herschel G. JUMPER.
No. 52049.
Supreme Court of Mississippi.
September 24, 1980.
Barrett J. Clisby, Roberts & Clisby, Oxford, George M. Mitchell, Jr., Eupora, for appellant.
Fred B. Smith, Robert W. Elliott, Smith, Elliott & Fortier, Ripley, for appellee.
Before SMITH, P.J., and SUGG and COFER, JJ.
SUGG, Justice, for the Court:
Dobbs-Maynard Company, Inc., plaintiff, filed suit against Herschel G. Jumper for $46,350.99 plus interest from December 30, 1975 which plaintiff alleged was the balance due on a note executed by the defendant to the plaintiff on November 10, 1975 in the amount of $58,850.99. The jury returned a verdict for the defendant, plaintiff appealed and assigned four errors. (1) The trial court erred by not sustaining plaintiff's motion to strike defendant's affirmative defenses as having no basis in law; (2) the court erred by not allowing portions of a transcript of a case tried in the United States District Court for the Northern District into evidence; (3) the court erred by failing to grant plaintiff's motion for peremptory instruction; and (4) the court erred by not sustaining plaintiff's motion for judgment n.o.v. or in the alternative by not granting a new trial.
The issue in the trial court was whether defendant owed plaintiff the balance due *880 on the promissory note of November 10, 1975. Plaintiff contended that the note was given to it by defendant as payment or security for the campaign debt of defendant. Defendant raised the following affirmative defenses: (1) Fraud and misrepresentation of fact by plaintiff through its agent, Martinson; (2) lack or failure of consideration; (3) conditional delivery or delivery for a special purpose; (4) preexisting agreement and condition precedent; and (5) plaintiff was not a holder in due course of the note. The evidence introduced by each of the parties will be set forth in the opinion as each question is discussed.

I

WAS THE PLAINTIFF A HOLDER IN DUE COURSE?
The note in question was executed on November 10, 1975 at the Sun-N-Sand Motel in Jackson, Mississippi. The only persons present when the note was signed were Mike Martinson and the defendant. Martinson is the president, sole stockholder, and general manager of Dobbs-Maynard Company, Inc., the plaintiff. According to Martinson he had unsuccessfully attempted to collect the balance due on the account owing by defendant to the plaintiff. Martinson stated that defendant executed the note representing the outstanding balance due on defendant's campaign for Highway Commissioner of the Northern District and that he requested the note to be signed because a note is better security than an open account and he needed the note so he would have better protection, "If something like this came to pass, and it has come to pass."
The defendant testified that he signed the note at the request of Martinson as an accommodation to Martinson, who told him he was in a financial bind and needed the note so he could show it on his financial statement in order to get a loan from a bank. Defendant testified that Martinson assured him that he would never see the note again and that its sole purpose was to let Martinson borrow money on a bolstered financial statement.
Plaintiff claims it is a holder in due course of the note under section 75-3-302 Mississippi Code Annotated (1972) which provides in part the following:
(1) A holder in due course is a holder who takes the instrument
(a) for value; and
(b) in good faith; and
(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
(2) A payee may be a holder in due course.
Plaintiff contends that it took the note for value within the meaning of section 75-3-303 Mississippi Code Annotated (1972) which provides in part:
A holder takes the instrument for value
(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due;
The payee of a note may be a holder in due course when the instrument was not delivered to the payee by the maker but by an intermediary or an agent of the maker. We cite three cases where courts of other jurisdictions have held the payee of a negotiable instrument is a holder in due course. S. & C. Transport Co., Inc. v. McAlister, 528 P.2d 1140 (Okl. 1974); Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 296 Minn. 130, 207 N.W.2d 282 (1973); Waterberry Savings Bank v. Jaroszewski, 4 Conn.Cir. 620, 238 A.2d 446 (1967). These cases illustrate the conditions under which a payee may be considered a holder in due course.
The Court of Appeals of Oklahoma, Division 1, held in S. & C. Transport Co., Inc. v. McAlister, supra, that the payee in four checks was a holder in due course under the Uniform Commercial Code. The checks in question were signed by McAlister, the defendant, and delivered to J.W. Pitts who completed the checks and delivered them to the plaintiff, S. & C. Transport Co. Pitts was engaged in the feed and grocery business *881 but his credit rating had become strained and plaintiff would not continue to transport feed to Pitts except on a cash basis. Pitts and McAlister entered into a business arrangement under which McAlister would deliver signed checks to Pitts to be completed by him and delivered to the plaintiff. The maker of the checks, McAlister, did not deliver the checks to the payee, but delivery was accomplished by an intermediary, Pitts, so the court held that the payee was a holder in due course because it took the checks without notice of any defense on the part of McAlister.
In Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, the Minnesota Supreme Court held that Merrill Lynch was a holder in due course of a check issued by Eldon's to Merrill Lynch and delivered to Merrill Lynch by an agent of Eldon's. The agent of Eldon's, who delivered the check to Merrill Lynch, applied the check in payment of stock purchased by him, instead of purchasing stock for Eldon's as instructed by his principal. The court held that Merrill Lynch was a holder in due course under the Uniform Commercial Code because it took the check without notice of any defense against it or claim to it on the part of any person. The court concluded that a payee could become a holder in due course to a check delivered from the maker by its agent and that negotiation from a prior holder was not necessary to make the payee a holder in due course.
In Waterberry Savings Bank v. Jaroszewski, supra, the Fourth Circuit Court of Connecticut held that where no representative of payee was present when a note was signed, and no agent of payee participated in negotiations leading to the execution of the note, payee was a holder in due course under the Uniform Commercial Code.
The facts in this case are distinguishable from the facts in the three cases cited above in that the note was executed in an arm's-length transaction between an agent of the plaintiff and the defendant. Not only was Martinson an agent of the plaintiff, but was the president, general manager, and sole stockholder of the plaintiff corporation. Plaintiff, through its agent, Martinson, solicited and was awarded advertising work by Herschel Jumper in his bid for reelection as Highway Commissioner in the 1975 Democratic Primary. Martinson handled all the business of plaintiff in connection with Jumper's campaign and had full knowledge of all the facts surrounding the debt owed by Jumper to plaintiff. Plaintiff, through its agent, participated in and had full knowledge of the transactions out of which the note arose. This participation and knowledge of plaintiff precludes it from being entitled to the status of a holder in due course.

II

SHOULD PORTIONS OF THE TRANSCRIPT IN THE FEDERAL CASE HAVE BEEN ADMITTED INTO EVIDENCE?
At the trial defendant testified that he did not owe the plaintiff "one dime." However, defendant testified as a witness in the case of United States of America v. Edgar L. Boteler, Jr. on May 31, 1977 in the United States District Court for the Northern District of Mississippi as follows:
A. As I told him, many friends or citizens gave me contributions, throughout the campaign and prior to the campaign, that I used. Some of the money was my own personal money. After the campaign was over, I went to the Peoples Bank in Ripley and borrowed $20,000 to pay on the note, which I still owe most of. I went to the First American Bank in Corinth and borrowed $4,000 and paid on the campaign. Dobbs Maynard firm. Later on, Mr. Maynard called and needed some more money. My wife went to Kosciusko, where she was born and reared, and put her own personal property up for security and borrowed $5,000 to pay Dobbs Maynard on that campaign.
And according to the statements I still receive, I still owe some $43,000 on that campaign, of which I'm going to pay if they will give me the time and opportunity. This is how-and prior to that, I took money out of my own government check, *882 disability check, and paid much of the expense for that campaign.
Let me assure you again, not one dime, by the way, of E.L. Boteler was ever spent in my campaign.
.....
BY MR. FAWER:
Q. Just so it's understood, Mr. Jumper, Mr. Moreton asked you some questions about how you funded your campaign. I think you said you got these contributions, some of your own money. Then he directed your attention to-after the campaign you had to borrow some money. Right?
A. Yes, I've borrowed money since the campaign. But I'll pay them.
Q. Tell the jury, the cash we're talking about, that was cash paid during the campaign?
A. Yes. I assume the case was paid during the campaign.
Q. The 20,000 you borrowed from Ripley you borrowed on September 22, 1975, and you got a draft for it and that paid a debt you still had to Dobbs Maynard, after you had paid them already $50,000 in cash and about $15,000 by check.
A. I do know that there is a note for the $20,000 and I sat at the president of the bank's desk and called Mike Martinson from his office and told Mike Martinson to draw a draft for that amount.
Q. But that was after the campaign.
A. That was after the campaign, yes.
Q. But just so the jury understands, the 50,000 that you paid Dobbs Maynard in cash was during the campaign-
A. If the record says it was, I agree.
Q. Right. And the 4,000 from Corinth and the 5,000 additional-I don't know, I think you said you borrowed that against some land. I'm not sure.
A. My wife borrowed 5,000 against her property-
Q. And those were all in 1976, payments by check, to further reduce the debt you had to Mike Martinson.
A. I don't remember the exact dates. But it was late '76-yeah, I would say it was in '76 sometime. '75, '76.
Q. That is in addition to the $50,000 in cash that you gave to Mr. Martinson?
A. Why, sure, it would be in addition. And I still owe him more money.
Q. Because you signed a note for $58,000 to Mr. Martinson. Right?
A. I didn't remember, offhand, the exact amount.
Q. Refreshes your recollection, though, doesn't it? That after the campaign, of the 140-
A. I don't remember what it was then, but I know I paid some on it since then, yes.
Q. All right. The point is, during the campaign you paid him a total of approximately $100,000, half of it, $51,000, in cold cash.
A. You've got the record that he gave you. He didn't give it to me.
MR. FAWER:
Could I have this document marked for identification?
THE COURT:
Let it be marked.
THE CLERK:
Defendant's Exhibit No. 32 for identification.
Exhibit 32 was later introduced in evidence in the federal case and it was argued orally before this Court that Exhibit 32 and the itemized statement of plaintiff in this case are identical. We are unable to determine if Exhibit 32 is identical with the statement introduced in the state court for the reason that Exhibit 32 is not a part of the record before this Court.
Defendant pled several affirmative defenses and in support thereof testified that the plaintiff's agency fee for the first primary was $25,000 and for the second primary $20,000. Defendant testified that Martinson agreed to forgive the agency fee of $45,000 if defendant was not successful in his bid for reelection. Defendant also testified, as heretofore noted, that he executed the note in 1975 as an accommodation to Martinson and not as an acknowledgment of the debt.
*883 We are of the opinion that the testimony given by defendant in the federal case in 1977 conflicts with his claim that the agency fee was forgiven by plaintiff. The trial court should have admitted the pertinent parts of the transcript in the federal case for consideration by the jury because they have an important bearing on the question of the credibility of the defendant as a witness in his own behalf in this case.
Other portions of the federal transcript have a bearing on this question and on retrial all pertinent portions of the transcript should be permitted in evidence.

III

CONCLUSION
We also hold that the evidence shows defendant was indebted to plaintiff for at least $10,000, and for this reason the verdict of the jury for the defendant was erroneous.
Exhibit 6 shows the balance to plaintiff on September 23, 1975 to be $58,850.99. Defendant did not challenge the accuracy of Exhibit 6 which is a summary of the charges and credits on defendant's account with plaintiff. The balance of $58,850.99 was arrived at after giving defendant credit for all payments which he had made on his account with plaintiff. The invoice for the second primary agency fee of plaintiff was introduced in evidence. The second primary agency fee as shown by the invoice was $10,000; this is the amount that defendant was charged by plaintiff; and this amount was used to arrive at the balance of $58,850.99 due plaintiff. Both parties agree that the agency fee for the first primary was $25,000 and since defendant was only billed for $10,000 for the second primary agency fee, the total agency fee for both primaries was $35,000.
The jury returned a verdict for the defendant, thus accepting the testimony of defendant and two of his witnesses that plaintiff through its agent, Martinson, agreed to forgive an agency fee of $45,000 in the event defendant was not successful in his bid for reelection. Defendant and his two witnesses testified that the agency fee was $25,000 for the first primary and $20,000 for the second primary. Obviously defendant and his witnesses are mistaken in their testimony that the agency fee for the second primary was $20,000, because defendant was only charged $10,000 for the second primary agency fee as shown by the invoice introduced in evidence.
We conclude therefore, that defendant was indebted to plaintiff for at least $10,000 after defendant tendered into court a check for $1,350.99 to be applied on the agency account. The amount due is shown by the following recapitulation:

 Balance due plaintiff by defendant on September
 23, 1975 (Exhibit 6) ........................... $58,850.99
 Less payment by defendant in 1976 ................ 12,500.00
 _________
 Balance after payments ........................... 46,350.99
 Less amount tendered by defendant ................ 1,350.99
 _________
 Balance after tender ............................. 45,000.00
 Less agency fee charged to defendant
 First Primary ............... $25,000.00
 Second Primary .............. 10,000.00 35,000.00
 ___________________________
 Balance due after forgiveness of agency
 fee ............................................ $10,000.00

The final judgment does not direct delivery of the $1,350.99 check to plaintiff tendered by the defendant. We are unable to determine from the record whether the check was delivered to plaintiff. On remand, the trial court should direct the clerk to deliver the check to plaintiff if this has not been done.
Defendant raises for the first time on appeal the argument that defendant ratified the note by making payments on the note totaling $12,500. Plaintiff did not plead ratification and waiver in its declaration, did not plead ratification and waiver in its answer to the affirmative defenses of defendant, and the jury was not instructed on the issue of ratification and waiver. We therefore hold that the question of ratification and waiver is not before us on this appeal. We direct the parties attention to Brickell v. First National Bank, 373 So.2d 1013 (Miss. 1979) as a case bearing on the question of ratification and waiver.
Plaintiff also argues that it was entitled to a peremptory instruction, that its motion for a judgment n.o.v. or in the alternative *884 a new trial should have been granted. We find no merit in these assignments of error.
We therefore reverse and remand for a new trial because the trial court erred in sustaining an objection to the introduction of portions of the transcript of the federal case heretofore discussed, and because the jury verdict was erroneous in that defendant is indebted to plaintiff in at least the amount of $10,000.
REVERSED AND REMANDED.
SMITH and ROBERTSON, P. JJ., and BROOM, LEE, BOWLING and COFER, JJ., concur.
PATTERSON, C.J., and WALKER, J., took no part.